CUTRER, Judge.
This is a contract action. Roy 0. Martin Lumber Company, Inc. (Martin) sued Owen Motor Freight Line, Inc. (Motor Freight) for the value of the two loads of crossties which, after being picked up by truckers obtained by Motor Freight, were never delivered to Martin’s customer.[1] From a judgment in favor of Martin, Motor Freight appeals. We affirm.
The issue before this court is whether the trial judge was clearly wrong in his determination that a contractual relationship existed between Martin and Motor Freight so as to establish Motor Freight’s liability for Martin’s products which disappeared in transit.
FACTS
In September 1980, Martin, through its Dura-Wood Treating Company Division, contracted to supply 17,895 hardwood cross-ties to Railroad Builders, Inc. The crossties were to be delivered to a Railroad Builder’s job site in Prewitt, New Mexico. Martin, through various subsidiaries, maintained approximately twelve trucks to provide delivery of Martin products.[2] By late 1980, this fleet of trucks proved inadequate to provide the transport capacity necessary to satisfy the delivery schedule of Railroad Builders.
At this time, Martin was approached by Mr. Borron Owen, president of Motor Freight, about the possibility of Motor Freight doing some hauling for Martin. Discussions between Owen and Huey Campbell, Martin’s sales manager, resulted in a verbal agreement between the parties. Owen told Campbell that Motor Freight did not have the necessary ICC licenses and permits to haul the crossties across state lines. Owen indicated, however, that he could provide independent truckers, each of whom possessed the required ICC permits and licenses, to supply Martin’s delivery needs.
Pursuant to their verbal agreement, Motor Freight sent eight independent owner/operators to Martin between February 10 and February 16, 1981, to haul crossties to New Mexico. The last two shipments on February 16th never arrived. All other shipments hauled by the independent truckers, engaged by Motor Freight, arrived in New Mexico on schedule. In due course, Motor Freight billed Martin for the completed deliveries and Martin paid Motor Freight.
Martin contacted Motor Freight about the two missing loads and Motor Freight provided Martin information on the owner/operators who had picked up the cross-ties. Martin asked Motor Freight to pay for the missing merchandise and, when Motor Freight refused, Martin brought this suit.
The trial judge found that a contract existed between Martin and Motor Freight. The trial court did not, however, decide if the contract was a “contract of carriage.” Martin was awarded $10,403.00, the fair market value of the missing crossties, along with legal interest, and Motor Freight was charged with costs. From this decision Motor Freight brought this appeal.
LIABILITY OF MOTOR FREIGHT
Martin contends that the facts show that Motor Freight was employed as a “carrier” to transport and deliver the crossties from Alexandria, Louisiana, .to New Mexico. Motor Freight contends that it agreed simply to assist Martin in locating properly licensed independent truckers to transport the loads and to further assist by advancing money to these truckers, invoicing Martin for the deliveries and paying truckers for the hauling. Motor Freight states that the consideration that it was to receive for this accommodation or assistance was to get *677 Martin’s support in Motor Freight’s pursuit of an ICC permit.
The record reveals that the several independent truckers were sent to Martin by Motor Freight. The drayage tickets on each load, filled out by Martin’s employees at the yard office and signed by the respective drivers, reflect the carrier in each instance to be Motor Freight. Upon delivery, the drayage tickets, signed by the receiving party, were sent by the driver to Motor Freight. Motor Freight billed Martin for each delivered load at the rate of $1,100.00 per load, which was paid to Motor Freight by Martin. The record reveals that each driver was paid $900.00 per load, thus, Motor Freight was making a profit on each load. Motor Freight carried a file on each truck and supplied Martin with the information on the two missing trucks. Martin never had any direct dealings with the truck drivers. The dealing with the truckers was carried out by Motor Freight who was being assisted by Harold Ussery. Uss-ery maintained an office in Motor Freight’s offices. He was a friend of Owen and was acquainted with the trucking industry. Owen stated that Ussery was working as Martin’s agent in the signing of the trip leases “with each of the independent truckers.” Ussery testified that he was working on behalf of Martin as authorized by Campbell. He stated that he suggested to Campbell that they use the process of “trip leasing” with the truckers in order to obviate any problems with the ICC. Ussery stated that Campbell authorized him to sign the “trip lease” on behalf of Colfax Creosoting Company, a subsidiary of Martin. A “trip lease” was signed with each driver. These trip leases appear in the record. They are signed by Ussery on behalf of Colfax Creosoting as lessee and each driver as lessor.
Campbell testified that he never spoke to Ussery about any such lease. Campbell stated that, furthermore, he had no authority to enter into any such leases on behalf of Martin or Colfax Creosoting Company, thus, he could not give Ussery any authority to sign such leases. The lease forms were obtained from the office of Motor Freight. Usser’s name appears as “broker” on the Motor Freight invoices submitted to Martin for payment. Ussery was paid by Motor Freight for his assistance.
The trial court concluded that the documentation and credible testimony “shows that a contract existed between Martin and Motor Freight.” The trial court did not label the contract as a “carrier” contract but stated that the contract was such that Motor Freight was liable for the losses.
We conclude that the trial court was correct in finding this to be a contract. We further conclude that this was a “carrier” contract under the provisions of our Civil Code.
The definition of a “carrier” is set forth in LSA-C.C. art. 2745 as being those who “hire out their services for the conveyance of persons or goods or merchandise.” LSA-C.C. articles 2751 and 2754 establish the obligations of the carrier and liability in the event of losses in transit.[3]
We conclude that the factual finding of the trial court was fully supported by the record. Motor Freight, with the assistance of Ussery, undertook the transportation of Martin’s crossties to New Mexico for the price of $1,100.00 per load. This was accomplished by the use of independent truckers engaged by Motor Freight and/or Uss-ery on its behalf. The “trip leases” were not authorized by Martin but were used by Ussery and Motor Freight to obviate any problems with ICC since Motor Freight had no interstate permit. Both Motor Freight and Ussery made a profit from this business. As we apply the “carrier” articles *678 cited heretofore, we find that the trial court correctly found that Motor Freight was liable to Martin for the losses it sustained when the two truckloads of crossties were lost in transit. The trial court judgment shall be affirmed.
For these reasons, the judgment of the trial court is affirmed. Owen Motor Freight Line, Inc., shall pay the costs of this appeal.
AFFIRMED.

. Martin also sought statutory penalties and attorney’s fees under LSA-R.S. 45:1097, et seq. The trial judge denied recovery of these and Martin has not appealed this ruling.

. These vehicles, being owned or operated by Martin, could transport Martin products in interstate commerce without obtaining any permits or licenses from the Interstate Commerce Commission.

. LSA-C.C. art. 2751 provides:
“Carriers and watermen are subject, with respect to the safe keeping and preservation of the things entrusted to them, to the same obligations and duties which are imposed on tavern keepers in the title: Of Deposit and Sequestration.”
LSA-C.C. art. 2754 provides:
“Carriers and waterman [watermen] are liable for the loss or damage of the things intrusted to their care, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events.”